Your Honor, this is the first case of the afternoon. Call 208-838, Beacon State Illinois v. Ernesto Valle. On behalf of the applicant, Mr. R. Christopher White. On behalf of the athlete, Ms. Kelly Stayser. Mr. White, you may proceed. May it please the court, I'm Chris White from the Office of the State Appellate Defender on behalf of Ernesto Valle, the defendant. The central question presented for review here is whether the trial court erred in denying Mr. Valle's motion to suppress statements where those statements were the product of an unduly coercive interrogation which rendered them neither knowing nor voluntary. First off, the defendant is not contending a couple of things. The defendant is not contending that he was beaten, waterboarded, subjected to electroshock or any other sort of physical coercion that usually goes along with a coerced statement. Rather, the defendant in this case was questioned by FBI agents as well as officers who applied more sophisticated psychological techniques to elicit statements from the defendant of events that were consistent with the self-serving stories provided to them by the other two witnesses, Acevedo and Delgado, who were involved in the incident. And it also supported their belief of how events transpired. Counsel, let me ask you before we get started, what's our standard of review? I think in this case generally it's manifest weight. I believe in this case it's de novo because this court has ample opportunity to view of the suppression hearing the actual DVDs of the entire interrogation, all the interrogations that took place to the defendant. I believe it comes to four DVDs. Is the credibility of the defendant involved in your motion? The credibility of the defendant's statements as far as him providing untruthful statements? Any credibility of the defendant. Is that an issue in your motion? Not credibility as determined in the court. Credibility perhaps is determined on the tapes of the interviews that were submitted. But again, that credibility can be determined. The interviews were preserved on videotape or on DVD, so this court has the same opportunity that the court below had to judge the defendant's credibility. Do you stipulate that the videotape is the facts? There are no factual disputes regarding the videotape? Not regarding the videotape, no. There are two different videotapes. There are two sort of sets of videotapes. There's the videotape that was sort of the raw feed that was taken of the defendant's interrogations, both the night of the incident as well as 17 hours later. And there's also a videotape that was heavily edited for trial that was presented to the jury. And that takes off a lot of the defendant's statements as well as some of the statements by the officers, I believe. So it's shorter. But generally, no, from beginning to end, before the police officers enter the interrogation room until after the defendant used the tape that's rolling its entire procedure. It takes out a lot of the wait time, too. It takes out wait time and it takes out a lot of the defendant's consistent statements of I didn't do it, I don't know, I don't. That kind of stuff was all taken down, which eliminates a little of the context, but it is shortened down to a smaller version, yes. Mr. White, when the motion to suppress was heard and the trial was heard, was the defendant present? At the motion to suppress, I honestly don't remember. I don't remember from that particular hearing. I believe he was, but I don't think so. He wasn't questioned in any way regarding at that point. If he was present, and we'll assume he was for trial, you're conceding he was for trial. For trial, sure. And it is more likely than not that he was there for the motion to suppress. Isn't there an additional indication or isn't there additional facts that a trial court could garner from actually watching the video as well as watching the defendant as the video is played, body language, other issues, as well as other witnesses who testified? Because there are other persons identified in that videotape, the questioners, the FBI agent, people of that nature. Those people all had an opportunity to appear before the judge as well, didn't they? They did. The defendant's reactions, however, to the videotape I don't think are as important because what we are concerned with here is the defendant's mindset and his beliefs at the time that questioning occurred. So unless he stands up and says either I maintain my innocence or yes, I am guilty or something that I don't know what the trial judge or what the defendant would do that would help in any way disprove, prove what his mindset was at the time those questions were answered. And the same is true with the police interrogation. The police discuss the techniques that they use, that they use a lot of trickery to see if they do a lot of this intentionally. That does go to the mindset of the police officers at the time that this interrogation took place, but it doesn't go to sort of the objective view or even subjective view of the defendant who's placed in a position of listening to these questions or having to react to these questions. So I think the best evidence in this case is the videotape of the actual interrogation to see just how the police officers reacted and what the defendant's body language, language, that type of thing was in response to those specific questions that were given by the police. Are you asking us to make a de novo review of that tape? I was questioning that hearing, yes, yes. That that tape, our position is that that tape never should have been presented to the jury because of the unruly course of nature of the statements that it contained. Mr. White, currently in murder cases in particular, there have to be videotaped confessions. Why then don't those videotaped confessions just get filed here and we don't, we bypass the trial court altogether? What's the purpose of going to the trial court if we're going to do it de novo? Well, in many cases that may not be an issue. In fact, I would submit that. Well, why wouldn't it be? I mean, if we're looking at a videotape in that case, what's the difference with looking at a videotape in the other 50 cases that are out there down the pipe right now? Why don't they just come here? What I mean is the voluntariness of the confession may not be an issue at all times. If it is an issue, then it perhaps should be looked at here. That's why they have the videotape to determine. That's why I presume that's why they don't just bring the police officers in to testify at the suppression hearings as to the demeanor of the witness, the things that he said. That's why they have the videotape is to make it a little safer or a lot safer, presumably, for the defendant to make it a more accurate representation of what occurred. And if that does become an issue in other cases, then perhaps it should be reviewed by the Atomic Court in other cases. However, in other cases, there may be other types of evidence that further substantiate the videotape. There may be forensic evidence or other witnesses who are more credible than the witnesses we have here. Something like that, in addition to the videotape, that renders it perhaps not as important as it would be in a case like this. In the general case, could you think of any reason why the trial court would be in a better position to view the video and use a manifest way to the evidence test versus the appellate court reviewing it and using a de novo test or a manifest way to the evidence test? At that level, like, I can't think of a reason why that would occur because it's just a subject. Does the trial court have any advantage by seeing the defendant in real life, watching his mannerisms, hearing him speak, versus the appellate court, which, of course, would have no opportunity to make that type of comparison or give any weight to what the court saw when we reviewed the video? As a general rule, I don't believe so, no. And I think that's the purpose of the new rules, the death penalty stuff, the rules why in murder cases you have to actually preserve this stuff in some sort of telephonic way. And that is because then it can be accessed by everyone. It can be accessed by the reviewing courts. It can be accessed by the trial court. I can't think of a situation why maybe it would occur, but I don't think it occurred here, where the defendant would be able to really add much to those tapes just viewing the defendant's body language, that type of thing, particularly in a situation where the defendant doesn't testify regarding it. I don't believe so. I mean, because also body language in that type of situation would be so difficult to read. He appears nervous. He appears excited. You don't really know why that is just because he's watching that particular tape. He may be thinking something entirely different in a situation like that. So I don't see where in a case like this that that would be appropriate, no. Thank you. And we've seen from a lot of cases even lately where the technology has gotten so better, the technical aspects of police interrogation, that we don't have a lot of situations anymore, hopefully or thankfully, where defendants are subjected to a lot of physical exertion to get statements. But they're much slicker now. In fact, one of the police officers testified regarding the techniques that they use. They ignore any false information. They lead the defendant down a certain path. So you've got very highly skilled, highly trained police officers who do this on a regular basis. And they're out there to elicit statements, not necessarily to get to the truth or to find out what happened. And I think that's one of the problems we have here. Looking at the totality of the circumstance, you had these sort of seasoned detectives along with, in the later, more damaging tape, an FBI agent who came in on top of everything. You've got Mr. Valle, who's 18 years old. He had no previous arrests or interrogations. I think he had a minor curfew violation. But nothing that subjected him to this level of pressure, this level of interrogation. Although he was a high school graduate, a recent high school graduate, he did testify that he was in some special education classes and had trouble understanding. He generally comes across as, throughout the entire record, actually, as really a follower. He has friends who are gang members. He seems very deferential in tone to the police officers questioning. There's a lot of, what do you want me to tell you? What do you want me to say? Just tell me what you want me to say. And when they say, we want you to tell you the truth, and when his response is, I don't know anything about this, they say, that's not the truth. And they, at one point, leave the room or lead him along. And they give him these false choices of either telling the truth, which is what they want to hear, which is an incriminating statement, or to continue to lie or remain silent at all. And it's particularly true in the case of FBI agent Camacho, who arrives at night, about 16 hours, I think, something like that, the night of the arrest, who comes in with the other two, immediately identifies herself as an FBI agent, jumps on the fact that someone may be confused why an FBI agent is involved in a case like this, and proceeds to tell the defendant that the victim was a federal informant. We know you shot him. We just want to know whether or not you knew he was a federal informant. That the federal, the feds are involved. Fed prison time is longer, so you better cooperate if you want us off your back, as she put it. And she showed a CD that she claimed contained wired statements of the defendant bringing the shooting. None of this information was true. Zero. Nothing she told the defendant at that point was true, other than you can be convicted for lying to her. But other than that, nothing was true. That we know can happen. We know. Exactly. And as a matter of fact, that type of statement, in fact, sort of gives weight or does give weight to the police officer's statements of, okay, you've talked to us, and we all know you lied to us for the entire two hours of the previous interrogation. Now we've brought her in, and if you lie to us now, you can go to jail. So it does add a little added element of that, I believe. Is that trickery, or is that the truth? The statement she gave was, well, the fact that you can lie cannot lie to an FBI agent. We all know now it's true. But the rest of the statements that she made was trickery, and none of them was true. The victim was not a victim. There's nothing wrong with trickery. There's nothing wrong with trickery. That's true. There's nothing wrong with trickery. But you can't still have deliberate fraud or deceit that magnifies an emotionally charged matter to the point where the rational decision to cooperate becomes overborne by the defendant, which is what I think happened here. And while trickery is generally permitted, it's still a case-by-case, totality-of-circumstances situation. It may well be that in some cases, if you've got a very experienced defendant who has sort of been through the system, and he's much older and much more sophisticated, this type of stuff may be more permissible, given the effects of a different case. But I think once trickery is used by the police, and it is permitted in many cases, but once it is used, I think there becomes a potential there for coercion, and it's something that the police should pay more attention to. It shouldn't just be we can use trickery, so we will use trickery, and we will then elicit statements from the defendant that aren't necessarily true but are consistent with how we've decided the case should go, which is what appears to be here. In fact, they give the defendant a lot of, you know, when the defendant does make his statements and they ask him what happened, he gives a lot of incorrect information, which indicates, I think, a desire to help the police, which kind of goes along with his follower mentality, is it's not necessarily a true recollection because a lot of this is incorrect. He said the shooting occurred on his way to his house from a party, and that's not what Acevedo and Delgado said. They actually testified or told the police differently. He did not know on which street the shooting occurred, even though he lived in the area. He couldn't describe the victim's vehicle, which is a victim of drugs. So he stood up to the fact finder and determined whether the state witnesses were telling the truth or whether the defendant was telling the truth, didn't he? If it got to that point, but our claim is that this tape never should have even been admitted and that this isn't something the jury should have seen. This is something that the trial court should have determined were so inconsistent with the other evidence they had that it should have gone along with the decision to have this tape excluded. So if this had gone to jury, that he had testified in this way, then I think that's absolutely correct. But at the suppression level, we're claiming that this tape was so damaging to him that it shouldn't have even come in. Is there anything in this particular record that disputes the fact that he bragged about this later? Is that a disputed issue or is that an issue that they have nailed down or is truthful? I don't think there's anything that supports it, actually. You had FBI agent Camacho say this contains this tape, which says this occurred, but there was no such tape. The only other people who have testified to that were, as I said, Delgado and Acevedo, who were both cousins. One of them was the nephew of a police officer who was there during the interrogation. And as a matter of fact, along with that claim about bragging about this, even if it were true, and I don't believe there was anything in there to suggest that it was, one of the officers even said at one point during the interrogation, we know that you talk a lot of smack, this is what it's all about, you've got to make yourself sound like a big man. So the officers even seem to buy into the fact that particularly, given Mr. Valle's sort of follower mentality as it seems to be here, we're just going to go all the way. Okay, I'm sorry. So we just ask that the defendant's statement should be reversed, the order of granting the defendant's statement should be reversed, and the cost should be remanded for retrial. Thank you. Good afternoon, Your Honors, Counsel, may it please the Court. My name is Kelly Stacey, appearing here today on behalf of the people. When the defendant was taken into custody for questioning for the murder of Jesse Lozano, officers took great care to make sure that he knew and understood his Miranda rights. The record shows that the defendant was advised of his rights, he signed the waiver of his Miranda rights, the record shows he's a high school graduate, he can read and write, he understands the English language and, in fact, he's bilingual in English and Spanish. Officers didn't stop there. They didn't take his word that he could read and understand English. They asked him to begin to read the Miranda rights out loud, which the defendant did, had no trouble at all reading those rights out loud back to the officers. The first interview of the defendant lasted for two hours. He was then taken to a holding cell where there was a bunk provided for him. He stayed there for 17 hours. The second interview lasted an hour and 40 minutes, and the total time of the defendant's detention was 20 hours and 34 minutes. There were times when they actually took him from the cell, from his bed, and just put him in the interview room and left him sit there for like an hour at one point, correct? Right. There were, during those times that I just mentioned, there were time periods within that that he was left to sit there by himself. What's the state's position on the standard of review? The standard of review is that the trial court's findings of fact are entitled to great deference and are not to be reversed unless they're against the manifest way of the evidence. The ultimate ruling on the trial court's decision not to suppress the videotaped statements is entitled to de novo review. During the defendant's... Even if we can look at the same thing that the trial court did? I believe you can look at the same thing that the trial court did, and I believe that if you do look at the DVD, which there are very long DVDs here, you would come to the same conclusion that the trial court did, that there was no coercion, that the defendant knew and understood his rights, and that he freely and willingly gave up those rights and decided he wanted to talk to the police that day. So if we did it de novo or manifest way de novo, it shouldn't be any different? I believe you would come to the same conclusion under either standard. But why would we... You heard Mr. White's argument. Why would we, as a court of limited jurisdiction, assume a de novo posture right off the bat? What would be the purpose of that? Well, I think that the court... Or why shouldn't we, from your perspective? I think this court's charge is to determine whether or not the findings of fact made by the trial court, which were the defendant was articulate, he understood his rights. Not only did the DVD show that, but I have to correct defense counsel that the defendant was present at the hearing on the motion to suppress. He did testify, and he unequivocally and clearly said, I understood my rights and I agreed to talk to the police. The record at page 144 verifies that. But in any event, what the trial court's determinations of the facts were are clearly set forth in the record, and I do believe that the DVD backs that up. If this court finds that the DVD does not back up the trial court's determination, then I think you can make the determination that it's against the manifest way of the evidence and reverse those findings of fact. But I don't believe that's what will occur when you do have an opportunity to take a look at the DVDs. During the defendant's detention, he was given water, a blanket. Even though he's underage, he was given two cigarettes at his request. He was given a Coca-Cola. He was offered food, but he refused it. He was not handcuffed. He was given bathroom breaks. He was not threatened or injured, and he was not incapacitated. The first DVD clearly shows that the defendant said, yes, I understand my Miranda rights. The second DVD, they went over the rights with him again. They didn't read them explicitly to him again, but they said, you remember those rights we talked about earlier? Those are still in effect. Do you understand those? The defendant again said, yes, I understand those rights. Again, he agreed to talk to the police. Most notably, even after his confession at the hearing on the motion to suppress, the defendant again testified under oath, I understood the rights. He can't make the argument now that he did not understand those rights. And even though he knew and understood the rights that he was giving up, he still agreed to talk to the police. At no time did the defendant ever ask that questioning stop. At no time did he ever ask for an attorney. He never invoked his right to remain silent. And perhaps as important as all of that, he never even once said, I don't understand what my rights are. Can you explain them to me? Can you do a little better job of letting me know what those rights are? What's your answer to the defense argument that the techniques of the police in interrogating the defendant reached a level in context with respect to the defendant's age and background that we have to draw a line somewhere to limit that type of interrogation technique? Well, that's exactly what the trial court was charged to do in this case at the hearing on the motion to suppress. The court determined that the defendant was a high school graduate, that he was articulate in his responses, that there was coercion as there is inherent in any interrogation. You're not free to leave. You've got individuals throwing questions at you. But there's nothing inherently wrong. There's nothing illegal and nothing that says that a statement is to be suppressed. If the officers use misrepresentations, they can lie to the defendant. This court in People v. McDaniel had occasion to review some other cases where a defendant was lied to and told that his fingerprints were at the scene when that was altogether false. He was told that your co-defendant pointed to you as the trigger man, and that was false. In that case, suppression of the confession was not warranted. And I think that's what we have here. We do have two officers at a time talking to the defendant. It's true that an FBI agent came in, but as counsel alluded to, we're all aware that what the FBI agent told him was true, that it is against the law to lie to an FBI agent. That's a felony in the state of Illinois and anywhere else for that matter. How about the psychological techniques and the psychological abuse that he was alleging that occurred as a result of their behavior? I don't see anything specific that the defendant has pointed to that shows that he was under any extreme psychological coercion. And I did submit and the court granted the citation for additional authority in the case of Burgess v. Tompkins that the U.S. Supreme Court just decided in June of 2010. And in that case, the court looked at, first of all, whether or not there was a waiver of defendant's Miranda rights, and in that case they found there was. They said that there was no indication that the defendant, Tompkins, in that case, did not understand his rights. And from that fact, it follows that he knew what he gave up when he decided to speak to officers. Of course, Justice Sotomayor, joined by four other judges, said, well, that is a significant delusion of what we understand to be Miranda. What's your response to that? Well, my response is the ultimate ruling is that I believe that this case is consistent with other cases by the U.S. Supreme Court. And regardless, that's what the opinion of the majority of the court is. The second thing the court looked at was this guy was told what his rights were. He was told he had a right to remain silent. He decided not to invoke that. He made what arguably amounted to a confession in the case. And most notably for this question is the third thing the court looked at was whether the defendant was coerced. And there the court said Tompkins does not claim that police threatened or injured him during the interrogation or that he was in any way fearful. He was alleging psychological coercion because they asked him a question of a religious nature. Did you pray to God after you murdered this person? And the defendant said yes. I can't imagine much greater psychological coercion than that, and that wasn't present in this case. So I don't see anything that rises to the level that would indicate that the defendant's statement should have been suppressed. Even if you determine that the trial court improperly allowed this videotaped confession where the defendant admitted that he, quote, And he clarified that means I shot someone. He further admitted that he was blessed in and became a member of the Latin Kings because he shot someone. But even if you set that aside, any error was harmless because there was other evidence that overwhelmingly established the defendant's guilt. The first is current witness Christopher Acevedo, who was asleep in the backseat of the car, apparently unaware of any of the events that were transpiring at the time. He heard gunshots. He woke up and he sees the defendant running back towards the car. The defendant told Acevedo and Delgado, the other occupant in the car, quote, I got the nigga. I got my crown. Acevedo also heard the defendant admit to the shooting when they went back to the Latin Kings party. The defendant said at that time I came home and the testimony was, well, that means he became a gang member as a result of that shooting. What was Acevedo's, I mean, was he totally unbiased? Was he a totally clean witness, if you will? Did he come with some baggage? Hector Delgado was charged with and found guilty of conspiracy, sorry, pleaded guilty to conspiracy to commit first degree murder, and he received a 10-year sentence. There's no evidence that Acevedo committed a crime at all. He didn't know what was going on. What was his motive to testify? What was his motive to testify? I think initially when he was interviewed, he said I don't want to have anything to do with it. But I think when he was subpoenaed to testify, he realized, well, I'm going to have to tell the truth about what I saw and what I heard that day. He didn't see that much other than he heard the gunshots and saw the defendant run back. But there's nothing showing that he committed a crime and that he was given any favorable treatment as a result of his testimony. I believe he testified truthfully, and I believe the jury could have made that determination. Well, he wasn't charged with anything, was he? No, he wasn't charged with any crime. And I don't believe that police could or the state could establish that he committed a crime under these circumstances. Well, they could have tried, but they never charged him with anything. They never charged him with anything. Not like they charged him and dismissed it. It just never was charged. That's correct. He was never charged. So you also have Hector Delgado, who drove the vehicle. He testified that he saw the defendant with the gun, that the defendant left the vehicle, fired several shots at the truck, and came back to the car. So in addition to the two witnesses who testified that the defendant was the killer, the night that officers arrived at his house to pick the defendant up, they used the PA system in order for all the occupants of the house to come outside. The defendant came out first. Following shortly behind him was the defendant's brother. When the defendant's brother came out of the house, the defendant told officers, that's my brother, he's got nothing to do with this. That is evidence of consciousness of guilt. All of these things I've discussed here show admissions of the party opponent. They're all admissible. Any argument about inconsistencies brought up by a defense counsel go merely to the weight of the evidence. They do not go to the admissibility. It is strictly up to the finder of fact, in this case the jury, to make the credibility determinations and to determine which evidence, if any, they want to accept and which they do not want to accept. So in light of all of that, the people respectfully request this court affirm the trial court's denial of the defendant's motion to suppress and affirm the conviction for first degree murder. If there are no other questions, I'll conclude there. No, thank you. Thank you. I would submit that the motivation for Acevedo and Delgado to give police statements is they didn't want to go to prison for murder. You're taking a situation where the only evidence against the defendant is the testimony of, other than this videotape, is the testimony of Acevedo and Delgado. Now, had the defendant incriminated either Acevedo or Delgado, we'd be in an entirely different situation, perhaps, where you had two against one going the other way. So because the defendant then maintains his innocence throughout this ordeal, other than the statements, I don't think somehow that gives more credence to the testimony of those two. As a matter of fact, I mean, I know it's well established that the eyewitness testimony of just one credible witness is sufficient to support a conviction. And here we have two witnesses, but neither of them are anywhere near credible. That's the sum and substance of the evidence, aside from this interview. But that's not our fault. That's correct. But what I'm suggesting here is that's why it's all that more, why it's not harmless error to allow in this videotape, because if you remove this videotape and you're left with the remaining so-called evidence, you have a much weaker case. In fact, you may not have any case that this tape, you know, I don't think it can be said that this tape did not impact the decision. In fact, the jury has to see the tape again at least once. So they were focusing on this tape at the time. And it's true, as the state's counsel said, that, you know, the officers took great care to provide him with water. They asked for bathroom baths. They gave him a Coke. They let him smoke. But the officers also know they're on videotape. They're going to do a lot of this stuff because they know it's going to appear reasonable. And the signing of the Miranda warning is not by itself prima facie evidence that the defendant waived his rights. As a matter of fact. Well, according to the Tompkins case, the fact that he said boo after he signed them is more than sufficient. Well, and Tompkins is even different because Tompkins, I believe, the defendant in that case stayed mute for the entire. Until the last 15 or 20 minutes. Until the very last 15 or 20 minutes where he's asked, I believe, a single or perhaps a few questions and then speech. Here, on the other hand, the defendant continually affirms his intelligence or affirms his innocence. In fact, all through this thing, he continually says that. And this is not a case where you have one tricky question about did you pray to God or, you know, that type of thing. This is an FBI agent coming in and saying we have all this stuff on you. You better cooperate. You don't want the feds on your back. None of it's true, by the way. But just so you know. And you've got this, you know, this 18-year-old kid, essentially, who has no experience in the justice system who is being hit with this stuff. It may be that at the time he signed that, you know, he was in a different state of mind. The police were rational with him. They asked him. But when that interrogation ended, and it was a two-hour interrogation, and then they dragged him back several hours later and added the element of the FBI agent and then continued to ask the questions and then framed them a little differently to get a little different response. Not so much what did you do, but why did you do it? And when he responds, I didn't do it, they said, no, no, no, that's not what we're asking. We're asking why did you do it. Otherwise, we're not going to talk to you, and the FBI agent's going to have to explain to her boss why she's not coming back to Washington with you, which essentially, you know, was in there. It's a much more, I think, intimidating situation than the one that was presented in Tompkins or in most cases. At the time of that interrogation, this disc that she's flashing about probably might have had her favorite music on it. But by the time Traub came around, she had that evidence. Isn't that correct? The bragging out, the two witnesses testifying? Well, even if she did, though, I think you still have to go back to does this tape come in and what's the defendant's mindset at that time? And so when the defendant, you know, is, when she tells the defendant, hey, I got all this, and you know what you said, and he's, as we know from even the statements of one of the police officers, that he's talking smack, as the police officer put it. He's going in around these, you know, Latin King members that he's trying to impress and telling them, you know, worst case scenario, the fact that it is contained on that disc. He's telling them all of these things, none of which are consistent in what he told the police, and none of which is consistent with what Acevedo and Delgado told the police. Well, the opposite side of that, the talking smack, is that if he's just talking smack, he got really lucky that night and came upon a really fresh murder that he was able to take credit for. Well, right, if that's true, or he knew about the murder because he just watched Acevedo do it. I mean, there's a number of ways he also could have known about the murder, but that's true, and that's only if that evidence even existed at the time, which it didn't at the time of the interrogation. So I think also the defendant states as a defendant could read and write, and he could, but not well. You know, if you look at the tape, he stumbles over the lines. I have one question, and that relates to, as I read through information before me, the witness who comes out of his house because he's just gotten up for work seems to see a truck rolling backwards, and one of the two, and I'm not sure if it was Delgado or Acevedo, sees a truck rolling backwards. That's, again, I mean, is that what happened? That somebody, two people testified that they saw this truck rolling backwards into a tree or a fence? It would have been, but again, one of those people was Acevedo or Delgado, so I think you have to eliminate. I think obviously that's what happened was Zano was shot in the truck, and it appears to have rolled backwards from the pictures and everything. And it doesn't seem to be much question but that the defendant, Acevedo, and Delgado were together much of the night, if not at this time. So even if they were, even if the defendant did not commit this, if the defendant did not commit this, they still could know that because they could have pulled the trigger. And based upon that, even if it was one of the other two who pulled the trigger, there was still a credibility determination by the jury after trial that it was defendant rather than Acevedo. Well, they couldn't choose between the other two, but they believed them and didn't believe him. But they had the tape. Right. If you didn't have the tape, I think you may come to an entirely different conclusion if you didn't have the defendant's own statements. And if the jury did not see the trickery being used as well, it may not be any more sophisticated than the defendant at this, and it's a very slick interrogation process. And they get evidence which isn't necessarily the truth, but it is evidence consistent with what they want to hear at that time, or what Acevedo and Delgado told them. Your time is up. Thank you. Thank you. Thank you. Bye.